1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11    MILTON N. HAYES,                    )    No. C 11-00161 EJD (PR)
                                          )
12              Petitioner,               )    **ORDER DENYING PETITION FOR**
                                          )    **WRIT OF HABEAS CORPUS;**
13        vs.                             )    **DENYING CERTIFICATE OF**
                                          )    **APPEALABILITY**
14    ANTHONY HEDGPETH, Warden,           )
                                          )
15              Respondent.               )
                                          )
16                                        )
      _____ )
17

18          Petitioner has filed a <u>pro se</u> Petition for a Writ of Habeas Corpus under 28

19    U.S.C. § 2254 challenging a judgment of conviction from Alameda County Superior

20    Court.  For the reasons set forth below, the Petition for a Writ of Habeas Corpus is

21    **DENIED**.

22                        **PROCEDURAL BACKGROUND**

23          In 2008, a jury convicted Petitioner of first degree murder.  Resp. Ex. 11 at 1;

24    Pet. at 2.  The state trial court sentenced Petitioner to a term of seventy-five years to

25    life in state prison.  Resp. Ex. 11 at 1.  On May 13, 2010, the state appellate court

26    affirmed the judgment.  Resp. Ex. 11.  On September 1, 2010, the California

27    Supreme Court denied review.  Resp. Ex. 13.

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Petitioner filed this instant petition for a writ of habeas corpus on January 11,

2    2011.  Doc. #1.

3                                    **DISCUSSION**

4    A.    <u>Factual Background</u>

5          The facts of Petitioner's underlying offenses were summarized in the state

6    appellate court's opinion:

7              A.    The Crime and Investigation

8                   On the evening of Sunday, July 25, 1999, Charles Turner
      was parked at the San Leandro marina when he heard a woman's
9    voice.  Forty or fifty yards away from him, he saw a short,
      heavyset White woman [FN2] get out of a car with her shoes in
10   her hands and walk away.  A tall, muscular Black man [FN3] in
      dark pants walked up to her, gripped her arm and tried to bring her
11   back.  The woman told him to leave her alone.  The man turned
      her loose and she walked on toward the boat dock.  The man got
12   into his dark-colored Cadillac, made a U-turn in it and drove to a
      location almost 200 feet away from where his car was first parked.
13   He parked the Cadillac a short distance from the woman.

14             FN2.  Turner testified that the woman might have been six
             to eight inches shorter than the assailant.  Zepeda was five
15            feet eight inches tall.  Hayes admitted that he was five feet
             11 inches tall.
16

17             FN3.  At different times, Turner described the man as six
             feet four inches tall and close to six feet tall.  He also said
18            that the man was taller than Turner himself, who stood five
             feet 11 inches tall.
19

20                  Turner was curious, so he drove his truck closer to where
      the two people were.  As he watched, the man got out of his car,
21   walked up to the woman and hit her in the face.  She fell back
      onto the sidewalk and the man stomped her repeatedly with his
22   foot.  [FN4]  Then, the man got into the Cadillac and quickly
      drove away from the marina.

23             FN4.  At the preliminary hearing, Turner testified that he
             could not see the woman after she fell, because a row of
24            hedges blocked his view.

25                  Turner and several other eyewitnesses to the assault went
      to the injured woman, who lay gasping and moaning.  She was
26   barely moving.  Someone called the police.  When San Leandro
      police arrived shortly after 10:00 p.m., they found the woman
27   lying in a pool of blood on the marina sidewalk.  She had been
      severely beaten.  Her face and hair were bloodied.  Head wounds

28

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

exposed her skull and brain tissue. The unidentified woman was taken to a hospital for treatment. Turner gave police a general description of a Black male who fled the scene in a dark-colored Cadillac.

The next morning, on Monday, July 26, 1999, the woman died. Having learned that she was Tina Zepeda, the police went to her home and advised her family of her death. The police learned that Zepeda was last seen the day before in the company of her boyfriend of 18 months – appellant Milton Nathaniel Hayes. Zepeda and Hayes left her home about 2:00 p.m. in Hayes's blue Cadillac, saying they were going to attend a kite festival. [FN5] At that time, Hayes was reportedly wearing blue jeans, a flannel shirt and white shoes.

FN5. There was evidence that Zepeda had purchased the Cadillac and gave it to Hayes to drive.

Directed to the nearby Oakland home where Hayes lived with his parents, the police found Hayes there. He told them that he had left his car and Zepeda at the San Leandro marina at 6:00 p.m. the night before, had returned home by 8:00 p.m. and had spent the night there. However, Hayes's father told police that his son had not spent the night at home – instead, it appeared that he had spent the night in Oakland with Yvette Anderson, his former girlfriend. Hayes was arrested for Zepeda's killing.

San Leandro police went to Anderson's home and questioned her. She told police that Hayes appeared at her door about 10:00 p.m. on the previous evening. He had been wearing black dress slacks, a multi-colored sweater and black shoes. Hayes had been drinking – he had a beer in his hand – and he seemed nervous. His hand was cut and bleeding. He told Anderson that he had gotten into an argument with one of his partners and hurt him badly. Anderson bandaged the wound. Hayes also told Anderson that he had argued with his new girlfriend and that they had separated. Sometime that evening, Anderson moved his car, which was blocking her neighbor's driveway. Before he left the next morning, Hayes told Anderson that he did not need the car because he would be going away for a while. She asked if he meant that he would go to jail and he did not answer. He told her that she could keep the car. The police searched Anderson's home, but found nothing inside. Hayes's blue Cadillac was found near her home.

Armed with a search warrant, San Leandro police searched Hayes's home. They found a pair of dress shoes, a pair of gray pants with a rust-colored stain, a jacket, indicia of Hayes's occupancy, and keys. Some of these items came from Hayes's bedroom and some were found in a laundry room crevice. Anderson identified the clothing as those Hayes wore on Sunday night.

One of the keys found in Hayes's bedroom fit the blue

1  Cadillac that was parked near Anderson's home.  The Cadillac
was seized and searched for evidence.  Human blood was found
2  on the gas pedal, the steering wheel cover, the horn cover and the
driver's seat of the car.
3

4  Blood samples were taken from Hayes and from Zepeda's
body.  DNA testing later established that the blood found on the
gas pedal of the Cadillac, the dress slacks and the shoes found at
5  Hayes's home matched Zepeda's DNA [FN6] and could not have
been his.
6

7  FN6.  The DNA typing expert used a typing method that
matched nine segments of DNA with the control samples.

8

9  B. Pretrial Matters

10  On July 28, 1999, Hayes was charged with the first degree
murder of Zepeda.  Counsel was appointed to represent him.
11  After a preliminary hearing, Hayes was held to answer for murder
in January 2001.  An information was filed, alleging that Hayes
was guilty of murder and that he had suffered six prior
12  convictions. (§§ 187, 667, subds.(a), (e)(2)(A)(i), 1170.12, subd.
(c)(2)(A).)  Hayes entered a plea of not guilty and denied the truth
13  of the prior conviction allegations.

14  In the next few years, the trial court repeatedly evaluated
whether Hayes was competent to stand trial.  Again and again,
15  criminal proceedings were suspended, only to be reinstated a few
months later. (§ 1368.)  During this period, Hayes was committed
16  to Atascadero State Hospital for a time. (§ 1370.)  By September
2005, when criminal proceedings were reinstated for the last time,
17  one mental health expert advised the trial court of his opinion that
Hayes was malingering.

18

19  During those times when criminal proceedings were
ongoing, the prospect of an insanity trial arose.  In October 2004,
20  Hayes personally withdrew his 2001 not guilty plea and entered a
dual plea of not guilty and not guilty by reason of insanity (NGI).
(§ 1027.)  The trial court ordered mental health experts to provide
21  a report evaluating Hayes's sanity. (§§ 1026-1027.)  In July 2005,
a psychologist advised the trial court that in his opinion, Hayes
22  had been able to understand the significance and consequences of
his acts at the time of Zepeda's attack.

23

24  Until the fall of 2005, a series of appointed attorneys
represented Hayes.  He filed Marsden [FN7] motions against one
of them in May and June 2005.  In late September 2005, Lisa
25  Alexholland was retained by Hayes's family and substituted in as
his attorney of record.  The following month, she withdrew
26  Hayes's NGI plea and entered a not guilty plea.

27  FN7.  People v. Marsden (1970) 2 Cal.3d 118.

28

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

United States District Court

For the Northern District of California

Hayes's relationship with his retained counsel was also difficult.  A year later, Hayes wrote to the trial court, complaining about Alexholland's representation of him.  He wrote that she had not discussed the case with him and refused to turn over to him tapes that had been made by her investigator of reports on two potential witnesses.  Hayes stated that the evidence on these tapes would show that one of the witnesses against him had admitted to lying and that another witness could prove that someone else committed the crime.  He also told the trial court that his attorney had given these reports to the prosecution and that the prosecutor was withholding evidence that would prove his innocence.

In February 2007, an amended information was filed in this matter.  [FN8]  The amended information alleged that Hayes murdered Zepeda with malice aforethought and that this offense was both a serious and a violent felony.  (§ 187, subd. (a); former §§ 667.5, subd. (c)(1), 1192.7, subd. (c)(1).)  [FN9]  It also alleged his six prior convictions and noted that his prior convictions for forcible rape and forcible oral copulation required him to be sentenced pursuant to the Three Strikes law.  (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2).)  Hayes's demurrer to the amended information was overruled in April 2007.  At that time, Alexholland entered a not guilty plea on behalf of her client.  Hayes was present at this hearing, but did not personally enter a plea.

FN8. The clerk's transcript did not contain a copy of an amended information.  Two copies of an amended information were provided to us on appeal by augmentation.  One is unfiled and the other appears was filed but the date stamp is partly illegible.  To the degree that the file stamped copy of the amended information is legible, its date appears to be consistent with references to a February 23, 2007 first amended information cited in a minute order of the same date and in Hayes's demurrer to the amended information.  We deem the unfiled amended information to have been filed on or about February 23, 2007.

FN9. Although subdivision (c)(1) of sections 667.5 and 1192.7 has been amended since Zepeda's death in 1999, the former versions of those subdivisions are substantially the same as current law.  (See §§ 667.5, subd. (c)(1), 1192.7, subd. (c)(1); Stats.1998, ch. 936, § 13.5, pp. 6882-6885; Stats.1997, ch. 504, § 2, pp. 3141-3143.)

On the eve of trial in August 2007, Hayes sought to discharge Alexholland as his counsel.  He argued that his attorney was not communicating with him about his case and that she had not fully investigated it.  He claimed that after her investigator came to her with information from two witnesses that proved his innocence, she fired the investigator.  The trial court denied the

motion.

The following day, Hayes's challenge to the trial judge was denied. He also expressed his intention to fire Alexholland and represent himself, but he later withdrew that request. On August 9, 2007, Alexholland filed a confidential motion to withdraw, citing a breakdown in communications between Hayes and herself affecting her ability to effectively represent him. The trial court granted this motion.

From this point on, Hayes was represented by a public defender. In April 2008, the public defender was still undecided about whether to enter an NGI plea. As the trial date approached again, Hayes's public defender successfully moved to bifurcate trial of the murder charge from trial on the prior conviction allegations. A motion to suppress Hayes's prearrest statement to San Leandro police was denied. The trial court also denied Hayes's motion to dismiss based on a claim that Alexholland had provided him with ineffective assistance of counsel.

C. Trial and Sentencing

In July and August 2008 – nine years after Zepeda's death – the jury heard the evidence in the case. At trial, Charles Turner testified about what he saw between 8:00 and 10:00 p.m. on the night that she was attacked. He identified a photograph of Hayes's Cadillac as resembling the car that fled the scene.

Former San Leandro Police Sergeant Christopher Lux and San Leandro Police Detective Doug Calcagno testified about their investigation into Zepeda's death, which led them to Hayes's home. There, they spoke with Hayes and his father. Hayes had a fresh cut on the knuckle of his right hand. Calcagno observed that Hayes was wearing clothing different from what Zepeda's son had described him as wearing the day before. When Lux asked Hayes when he had last seen Zepeda, Hayes said that he had left her at 6:00 p.m. the day before at the San Leandro marina. He added that he had left Zepeda and his car with a friend and had gone home, where he had been since 8:00 p.m. Hayes could not provide police with either the name of the friend or the present location of his car.

Hayes's parents and Detective Calcagno went outside, leaving Lux with Hayes in the house. Calcagno learned from the elder Hayes outside the house that the son had not come home the night before, but had been picked up in Oakland that morning. Calcagno testified that Hayes's father told him that when he went to pick up Hayes in Oakland, the blue Cadillac was in front of the house. [FN10] Hayes's father told Calcagno that Hayes was wearing the same clothes then that he had on in Oakland earlier that day.

FN10. At trial, Hayes's father testified that when he met his son earlier that morning, he did not see the car.

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

6

United States District Court

For the Northern District of California

Calcagno's report made no mention of any statement from Hayes's father about seeing the Cadillac that morning.

In a few minutes, another officer [FN11] came to sit with Hayes while Lux went outside to speak with Calcagno. Lux and Calcagno conferred about the information that Hayes's father had provided. At this point, Lux decided that Hayes would be arrested for the murder of Zepeda. When Hayes walked out of the house, he was arrested. Hayes was placed in the back of the unmarked car and soon transported to the police department. At the time of his arrest, Hayes was wearing blue jeans and a sweater.

   FN11.  The officer Lux and Calcagno identified did not recall being in the house with Hayes and Lux, nor did his report include any reference to his presence there.

The jury also saw photographs of Zepeda's injuries. An expert pathologist testified that Zepeda's face had been crushed, resulting in numerous external and internal injuries. She died as the result of extensive blunt trauma to the head and face, inflicted by many blows inflicted with a lot of force. Her injuries were consistent with having been stomped on repeatedly while she was on the ground. Zepeda had a blood-alcohol level of 0.16.

Hayes's father testified at trial. He told the jury that his son had not spent the night of Sunday, July 25, 1999, at his home. At 8:45 a.m. on Monday morning, July 26, 1999, the father had picked Hayes up at Anderson's house and brought him home. Back at home, the family learned that Zepeda had been killed – news that upset Hayes.

After the People completed their case-in-chief, Hayes moved for acquittal on the first degree murder charge, arguing that no evidence of premeditation or planning had been presented. (§ 1118.1.) The prosecution argued that the physical evidence provided sufficient evidence to support a finding of first degree murder. The trial court denied the acquittal motion.

In Hayes's defense, the public defender offered a mistaken identity defense. The defense brought out evidence that Hayes was shorter than the taller assailant that Turner described. (RT 431, 463, 465, 467, 909; see RT 1590-1591) Beer cans found near the place where the Cadillac was first parked at the San Leandro marina were of a brand different from the one Anderson recalled Hayes drinking that night. The public defender also highlighted differences between the clothing that Hayes wore at the time of his arrest, the clothing that Turner described the assailant as wearing, and the clothes seized by police that were purportedly stained with Zepeda's blood.

The defense also offered alibi evidence, suggesting that Hayes could not have been at the San Leandro marina when Zepeda was killed about 10:00 p.m. Anderson testified that after Hayes came to her home on Sunday evening, they walked to a

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California

convenience store to buy some beer.  The owner of the convenience store testified that the store had closed at 9:00 p.m. Charles Roberson told the jury that the night when Zepeda was attacked, he gave Anderson and Hayes a ride from Hayes's house to Anderson's home.  He testified that this happened just as it was getting dark – sometime between 8:30 and 9:30 p.m. [FN12]

> FN12.  On cross-examination, Roberson admitted that although he knew Zepeda and knew that Hayes had been arrested for killing her, he did not give this information to police in 1999.

> The public defender also challenged the recovery, documentation and storage of the physical evidence during the years between Zepeda's death in 1999 and the time of the 2008 trial.  During argument, he suggested that someone tampered with the physical evidence, rendering it unreliable to support a murder conviction.

> In August 2008, a jury found Hayes guilty of first degree murder with malice aforethought.  (§ 187.)  The prosecution put on evidence of two of the six alleged prior convictions at a court trial.  When that trial was completed, the court found that Hayes had suffered these two prior convictions and that they constituted strikes.  (§ 667, subd. (d)(1).)  Hayes's motion to strike one or both of these prior convictions was denied.  In October 2008, he was sentenced to 75 years to life in state prison – 25 years to life for the murder conviction, tripled because of his two prior strikes. (§ 667, subd. (e)(2)(A)(i).)

People v. Hayes, No. A123433, 2010 WL 1918711 at *1-*5 (Cal. Ct. App. May 13, 2010).  Resp. Ex. 11.

B.      Standard of Review

        This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

8

presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied.  Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.  The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion.  See Ylst, 501 U.S. at 805; Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, an independent review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Recently, the Supreme Court vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions.  See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Premo v. Moore, 131 S. Ct. 733, 739-40 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Id. at 1307 (citation omitted).  With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

C.    Claims and Analysis

Petitioner raises the following grounds for federal habeas relief:  (1) the trial court erred by failing to suppress evidence of Petitioner's pre-arrest statement to police; (2) there was insufficient evidence to support the first degree murder conviction; (3) the trial court erred by failing to hold a trial on Petitioner's insanity plea; and (4) the trial court erred by denying Petitioner's motion to dismiss based on

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

1    ineffective assistance of counsel.  Each claim is analyzed in turn below.

2        1.    Motion to Suppress - Miranda claim

3        Petitioner claims that his pretrial statements should not have been introduced

4    because he was "in custody" at the time the police questioned him at his house, and

5    the police had not given him his Miranda[1] rights.

6        The state appellate court summarized the pretrial events as follows:

7            Before trial, the trial court conducted a hearing on Hayes's
         motion to suppress [his] prearrest statement.  It heard this
8        testimony about the investigation of the Zepeda homicide made by
         Sergeant Lux and Detective Calcagno: On the night of Sunday,
9        July 25, 1999, Calcagno received information that the man who
         assaulted Zepeda fled the San Leandro marina in a dark Cadillac.
10       The next morning, Lux and Calcagno went to Zepeda's Oakland
         address.  They learned that Zepeda had last been seen the day
11       before with Hayes, who was identified as her boyfriend.  Zepeda
         and Hayes were known to frequent the San Leandro marina.  The
12       location of Hayes's home in Oakland and a description of his blue
         Cadillac were given to the officers.  The police ran a computer
13       check on Hayes, which confirmed some of the information they
         had received.
14
15           Lux and Calcagno went to the Hayes residence, but no blue
         Cadillac was seen nearby.  There, they encountered Hayes's
16       father, who told them that he had just learned of Zepeda's death.
         When Lux asked if they could go into the house to talk with
17       Hayes, the father agreed.  Lux told the trial court that at this point,
         he did not consider Hayes a suspect.  However, Calcagno believed
18       that Hayes was a suspect because his Cadillac matched the
         description of the car seen at the scene of the attack.

19           Inside the house, Lux identified himself to Hayes as a San
         Leandro police officer and advised him that the police were
20       investigating Zepeda's death.  Hayes was crying and upset.  Lux –
         who, along with Calcagno, was dressed in plain clothes – said that
21       he wanted to ask Hayes some questions.  According to Lux, Hayes
         began talking and Lux let him do so.  [FN14]  Hayes told the
22       police that he had been with Zepeda the previous day at a
         Berkeley kite fair and later at the San Leandro marina.  He last
23       saw her about 6:00 p.m. when he left her – and his blue Cadillac –
         with a friend of his at the marina.  He told police that he arrived
24       home at 8:00 p.m. and spent the night at his parents' house.  When
         Lux asked, Hayes was unable to identify the friend to whom he
25       had loaned his car.  Hayes also said that he did not know where
         his car was.  Lux testified that this inquiry was the only one he
26       recalled making.

27
         _____

28       [1] Miranda v. Arizona, 384 U.S. 436 (1966).

FN14. For his part, Calcagno testified that Lux asked questions, which Hayes answered.

Hayes's parents and Calcagno were present during the interview. When Hayes's father asked if it would be better if he and his wife left, Hayes agreed that it would. The parents went outside with Calcagno; Lux remained with Hayes. Lux waited for Hayes to say more, but none was forthcoming. He testified that Hayes was not under arrest at the time that they spoke – in his mind, Hayes was merely a suspect.

When Calcagno was outside with Hayes's parents, he questioned the father. The elder Hayes told Calcagno that his son had not slept at his house the night before and that he had picked him up at Yvette Anderson's home about 8:45 a.m. that morning. At Anderson's home, the father had seen Hayes standing next to his Cadillac. Within five minutes after the parents went outside with Calcagno, Lux joined them. Detective Calcagno told Lux what Hayes's father reported to him.

Lux told the trial court that, at this point, he decided that Hayes was going to be arrested. When Hayes walked out of the house, he was arrested. Lux did not handcuff Hayes – he wanted to talk with the accused later and hoped to maintain a good rapport with him. Lux did not ask Hayes any more questions at that time. During this encounter, both Lux and Calcagno were carrying concealed weapons that neither drew out.

Resp. Ex. 11 at 9-11.

The state appellate court rejected this claim, explaining:

Hayes argues the fact that Lux and Calcagno were armed police officers supports his claim that he was in custody. There was evidence that Lux and Calcagno were armed and that they carried their weapons under their clothing. Neither of them had cause to display their weapons. There was no evidence that Hayes was coerced by any display of weapons or that he even saw the guns that one would presume a police officer would carry. To the extent that Lux's post-statement conduct is relevant, we observe that he chose not to have Hayes handcuffed. This tends to suggest an overall low-key, noncoercive approach that contradicts Hayes's claim of coercion. Thus, we conclude that the fact that the questioning officers were armed is less significant to the issue of whether a reasonable person in Hayes's circumstances would have felt free to leave than he would have us conclude. (See Oregon v. Mathiason (1977) 429 U.S. 492, 495 [police officers not required to administer Miranda warnings to everyone questioned].)

Hayes also argues that the officers prevented him from leaving by blocking his parents' driveway. Again, the facts do not present themselves as strongly in Hayes's favor as he would lead us to believe. Lux testified at the suppression hearing – conducted nine years after the event – that he did not recall whether he

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4
5
6

blocked the driveway of Hayes's house with the unmarked vehicle, preventing Hayes's father from leaving.  Even assuming arguendo that Hayes's father was blocked from leaving in his car, Hayes was inside the house at this time.  There was evidence that Hayes may have had a view of the front of the house through a window near where he sat, although Lux testified that he did not recall seeing Hayes through the window.  [FN15]  The evidence allows a reasonable inference that Hayes knew that the police had blocked his father from leaving.  However, as this would require us to draw an inference based on an assumption, we conclude that the inference he would have us draw is somewhat attenuated.

7
8
9

> FN15. Lux initially thought that Hayes might have been in a car parked in the driveway.  This testimony tends to counter any inference that Hayes was visible from the front window and, further, that Hayes himself could see what was occurring in front of the house.

10
11
12
13
14
15

Hayes argues that when he made his statement, the officers were standing while he was seated.  The record is conflicting on this point.  Lux testified at the suppression hearing that after he introduced himself and Calcagno to Hayes, both officers sat down.  Calcagno testified that he was standing and that he did not recall if Lux was seated or standing.  [FN16]  The inference that Lux loomed over Hayes while questioning the suspect is not well supported by the record.  [FN17]  To the extent that we are called on to make any factual inferences, we must draw those favorable to the trial court's ruling.  (See People v. Stansbury, supra, 9 Cal.4th at p. 831.)

16
17

> FN16. At the December 2000 preliminary hearing, Calcagno testified that both officers were standing.

18
19
20

> FN17. Other facts support a finding that the interview was not coercive.  Calcagno testified that Lux asked if he could speak with Hayes, and that Hayes said that he could.  Hayes's parents were present when he made the challenged prearrest statement.  Lux's entire interview – including the time after the parents left the house – took little more than five minutes.

21
22
23
24
25

Hayes cites the fact that when Lux left the house to talk with Calcagno, he left Hayes in the company of another police officer.  He ignores the fact that he had already made his statement to Lux by this point.  Common sense tells us that events occurring after a statement was given have little relevance to determining whether a reasonable person would have felt free to leave at the time that the statement was given.  (See Evid.Code, §§ 210, 350.)

26
27
28

Hayes argues that he was not free to leave because the focus of the investigation was on him and that Lux's questions were pointed.  The police questions focused on when Hayes had last seen his recently murdered girlfriend.  An inquiry into Zepeda's recent whereabouts is clearly appropriate in a murder

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

13

investigation, regardless of whether Hayes played any part in her death.

In addition, the evidence was conflicting about whether Lux questioned Hayes in more than an introductory manner before the prearrest statement was made.  Lux testified that after he told Hayes that he wanted to ask some questions about Zepeda's death, Hayes began talking and that he let Hayes talk.  Calcagno recalled that Hayes answered a series of questions posed by Lux.  While Hayes asserts that the trial court made a formal finding that an interrogation took place, the record suggests to us that the trial court did not do so.  This leads us to discount Hayes's claim that probing police questions suggested to him that he was already the focus of the murder investigation before he made his prearrest statement.

Hayes reasons that the totality of the circumstances would lead a reasonable person to believe that he was not free to leave.  This argument is contradicted by his own conduct.  After he gave his statement to Lux, Hayes did leave the house, at which point he was arrested on the basis of evidence that undermined his prearrest, exculpatory statement.  Many of the facts that Hayes argues support a finding of custody are exaggerated, lack logical support or are based on constructions of the record that contradict those tending to support the trial court's finding of a lack of custody.  Comparing the evidence that was offered at the suppression hearing against the applicable legal standard, we conclude that Hayes was not in custody at the time that he made his statement.

Hayes had no Miranda rights at this stage, because he was merely a suspect and was not yet in custody.  (See Miranda, supra, 384 U.S. at p. 444; People v. Mickey (1991) 54 Cal.3d 612, 648; see also Oregon v. Mathiason, supra, 429 U.S. at p. 495.)  As there was no custodial interrogation, the trial court properly denied the motion to suppress evidence of his prearrest statement.

Resp. Ex. 11 at 13-15.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence.  Miranda protections are triggered only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Mathiason, 429 U.S. at 495).  "[I]n custody" means "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Mathiason, 429 U.S. at 495).  It requires that

1    "a reasonable person have felt he or she was not at liberty to terminate the

2    interrogation and leave," as judged by the totality of the circumstances.  <u>Thompson</u>

3    <u>v. Keohane</u>, 516 U.S. 99, 112 (1995).  This determination is based on an objective

4    inquiry to determine: (1) the circumstances surrounding the interrogation, and (2)

5    whether a reasonable person would have felt at liberty to end the interrogation and

6    leave, given those circumstances.  <u>Id.</u> at 112.  The "totality of the circumstances"

7    determines whether a person was "in custody."  Relevant factors include:

8            "(1) the language used by the officer to summon the individual,
         (2) the extent to which the defendant is confronted with evidence
9        of guilt, (3) the physical surroundings of the interrogation, (4) the
         duration of the detention and (5) the degree of pressure applied to
10       detain the individual.

11   <u>United States v. Redlightning</u>, 624 F.3d 1090, 1102-03 (9th Cir. 2010) (footnote

12   omitted).

13       An interrogation conducted within the suspect's home is custodial, and

14   requires <u>Miranda</u> warnings, if the circumstances surrounding the interrogation

15   turned the home into a "police dominated atmosphere."  <u>United States v. Craighead</u>,

16   539 F.3d 1073, 1083 (9th Cir. 2008).  The following factors are relevant to this

17   "fact-intensive" determination: "(1) the number of law enforcement personnel and

18   whether they are well-armed; (2) whether the suspect was at any point restrained,

19   either by physical force or by threats; (3) whether the suspect was isolated from

20   others; and (4) whether the suspect was informed that he was free to leave or

21   terminate the interview, and the context in which any such statements were made."

22   <u>Id.</u> at 1084 (footnote omitted) (finding interrogation custodial where ten armed

23   officers from various agencies present, suspect escorted to back storage room and

24   door closed, and officers blocked exit).  Physically controlling a suspect during a

25   home search, even if necessary to preserve evidence and ensure safety, tends to

26   make a reasonable person believe he or she is in custody.  <u>Id.</u> at 1086.

27       Here, Petitioner argues that the trial court erred in its determination that he

28

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1   was not "in custody."  In support of his argument, Petitioner claims that Investigator

2   Lux asked pointed questions about Zepeda's death, and the location of the Cadillac;

3   neither officer suggested that Petitioner could leave if he wanted to; at least one of

4   the officers was standing during the questioning; both officers were armed; the

5   police never left Petitioner alone; and the police parked in a way so as to block the

6   driveway.  Pet. at 6-7.

7       However, the state appellate court rejected Petitioner's arguments, finding

8   that they were exaggerated or contradictory.  These factual findings are presumed

9   correct.  Thompson v. Keohane, 516 U.S. 99, 112-13 (1995) (recognizing that the

10  state court's determination of the circumstances surrounding the interrogation is a

11  factual finding that is entitled to a presumption of correctness under 28 U.S.C.

12  § 2254(d)).  Further, the "in custody" determination requires an analysis of the

13  totality of the circumstances.  Here, the evidence shows that Petitioner's father gave

14  the officers permission to speak with Petitioner; the officers' questions focused on

15  when Petitioner had last seen Zepeda; Investigator Lux and Detective Calcagno were

16  dressed in plain clothes and explained to Petitioner they were investigating Zepeda's

17  death; although both officers were armed, neither of them displayed their weapons;

18  even if the police parked in a way as to block the driveway, Petitioner clearly felt he

19  was free to leave as he did walk out of the house at some point prior to his arrest;

20  Petitioner's parents were present during the interview and asked if they should leave

21  – the police did not request their departure; the interview took less than five minutes;

22  Petitioner was never physically restrained; and, at the time Petitioner made his

23  pretrial statements, he was not isolated from others.

24      This Court is mindful that in applying § 2254(d) to custody determinations,

25  the state courts are accorded more leeway in reaching outcomes on a case-by-case

26  basis because the custody test for Miranda purposes is general.  Stanley v. Schriro,

27  598 F.3d 612, 619 (9th Cir. 2010) (citing Yarborough v. Alvarado, 541 U.S. 652,

28

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

664 (2004)).  A review of the record and the state court's opinion reveals that the state court's denial of Petitioner's <u>Miranda</u> claim was not an unreasonable application of clearly established Supreme Court law.  Petitioner is not entitled to habeas relief on this claim.

2. <u>Sufficiency of the Evidence</u>

Petitioner claims that his conviction should be reduced to second degree murder because there was insufficient evidence of premeditation and deliberation to sustain a first degree murder conviction.

The state appellate court rejected this claim.

> When we review all the evidence offered at trial, we find sufficient evidence from which a rational jury could find premeditation and deliberation.  First, there was evidence of planning from Hayes's act of moving his car to get closer to Zepeda before the assault.  The time required to start the Cadillac, drive it in a circuitous route around various parking lot obstacles to where Zepeda had walked in a more direct route, park it, and get out of the car was a sufficient period of time to allow planning.  The opportunity to reflect constitutes circumstantial evidence of premeditation and deliberation.  (See <u>People v. Wright</u>, <u>supra</u>, 39 Cal.3d at p. 593; <u>see also</u> <u>In re Larkin</u>, <u>supra</u>, 48 Cal.3d at p. 245.)
>
> Second, there was evidence of Hayes's motive to kill Zepeda.  Her conduct immediately before the assault suggests that she had broken off their relationship.  She ordered him to leave her, physically left his presence and appeared to pull away from him when he pursued her.  This inference was supported by Hayes's own report – made shortly after Zepeda was attacked – that he and she had separated.  This evidence would allow a reasonable jury to infer that Hayes was angered by Zepeda's rejection.  (See <u>People v. Anderson</u>, <u>supra</u>, 70 Cal.2d at p. 27 [prior relationship of parties may show evidence of motive].)
>
> Hayes argues that heated words or a physical struggle compel a finding that no premeditation and deliberation occurred, but the case law he cites establishes no more than that this conduct could create a reasonable doubt about premeditation and deliberation.  Indeed, our Supreme Court has expressly acknowledged that such evidence would be sufficient to support a finding of premeditation and deliberation, although it would not necessarily compel that finding.  (<u>People v. Wickersham</u>, <u>supra</u>, 32 Cal.3d at pp. 329-330.)
>
> Third, when Hayes struck his initial blow, Zepeda was knocked to the ground, landing on her back on a concrete sidewalk.  Then, he repeatedly stomped on her head with his foot

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

with so much force that multiple bones in her face were shattered and her head split open.  The pathologist's evidence suggested that Hayes did not strike haphazard blows, but aimed them at her face and head.  The manner of killing may be so particular and exacting to allow a reasonable jury to conclude that Hayes must have intentionally killed Zepeda according to a preexisting design to take her life, based on evidence of planning or motive.  (See People v. Anderson, supra, 70 Cal.2d at p. 27.)  The manner of the assault on Zepeda – particularly when viewed in the context of the other evidence of premeditation and deliberation offered in this case – supports a rational jury's verdict of premeditated and deliberated first degree murder.

Hayes argues that the fact that he did not use a weapon against Zepeda is evidence that he did not plan, premeditate and deliberate the murder.  In our view, the fact that Zepeda's injuries were inflicted by hand and foot rather than by the use of a weapon such as a gun may tend to support a finding that the manner of the assault demonstrated premeditation and deliberation.  It takes longer to inflict wounds by striking the victim to the ground and then stomping her repeatedly with a foot than it would take to inflict a rapid hail of bullets.  Injuries inflicted by hand and foot are necessarily inflicted at close range where the perpetrator can better assess the injuries as they are being inflicted.  The manner of injury suffered by Zepeda may thus be stronger evidence of an opportunity to stop and reconsider these actions – and thus, stronger evidence of an opportunity for premeditation and deliberation – than injury by other means such as gunshots might be.

Resp. Ex. 11 at 20-22.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference.  Jackson v. Virginia, 443 U.S. 307, 326 (1979).  The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  Id. at 324.  "[T]he only question under Jackson is whether that [jury] finding was so insupportable as to fall below the threshold of bare rationality."

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

18

Coleman v. Johnson, 132 S. Ct. 2060, 2065 (2012).

In California, first degree murder is the premeditated and deliberate unlawful killing of another with malice aforethought. See Cal. Pen. Code §§ 187, 189. A premeditated killing under California law is a "killing [that] was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." People v. Prince, 40 Cal.4th 1179, 1253 (2007) (citations omitted). The process of premeditation and deliberation "does not require any extended period of time." People v. Koontz, 27 Cal.4th 1041, 1080 (2002) (citations omitted). "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." Id. Planning activity, motive and the manner of the killing are significant, though not the exclusive, factors to consider when determining whether the killing was a result of preexisting reflection. Prince, 40 Cal.4th at 1253 (citations omitted).

Under these legal principles, Petitioner's claim cannot succeed. The record supports the conclusion that a rational trier of fact could have found the elements of premeditation and deliberation true beyond a reasonable doubt. As the state appellate court determined, that Petitioner drove a circuitous route just after he argued with Zepeda; that Petitioner and Zepeda argued, presumably over breaking off their relationship; and the severity and forcefulness of the way Petitioner killed Zepeda reasonably support the jury's determination that there was premeditation and deliberation. On such a record, Petitioner's claim that there was insufficient evidence is DENIED.

  3. <u>Sanity Trial</u>

Petitioner claims that his federal constitutional right to a jury trial was violated when the trial court failed to hold a trial on the issue of his sanity when Petitioner had not personally withdrawn his plea of "not guilty by reason of

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

19

United States District Court
For the Northern District of California

insanity."  ("NGI.")

The state appellate court summarized the pretrial events as follows.

> In January 2001, Hayes was charged by information with the murder of Zepeda.  At his arraignment the following month, an attorney was appointed for him and a plea of not guilty was entered.  [FN22]  In October 2004, his appointed counsel withdrew that plea and entered a new, dual plea – not guilty and NGI.  On the record and in writing, Hayes agreed with these pleas.  In September 2005, Lisa Alexholland was retained as Hayes's counsel.  A month later, she stated that "we would like to withdraw" the NGI plea and entered only a not guilty plea.  The trial court agreed.  Although Hayes was present and spoke about other matters, he was not asked about nor did he give his verbal consent to the change of plea.

> FN22. We have no transcript of this proceeding, so we cannot determine whether or not Hayes personally consented to this plea.

> In February 2007, an amended information was filed in this matter, making it clear that this was a first degree murder case and that the prior conviction allegations could result in sentencing pursuant to the Three Strikes law.  In April 2007, the trial court rejected Hayes's demurrer to the amended information.  Hayes was rearraigned and defense counsel entered a not guilty plea to the charges alleged in the amended information.  Again, Hayes was present, but was not asked about this plea.  No mention was made of an NGI plea.  A year later, in April 2008, the public defender filed a declaration stating that he had recently received the mental health records he needed to determine whether to enter an NGI plea on Hayes's behalf.  The trial record contains no further reference to any NGI plea or insanity trial.

Resp. Ex. 11 at 27-28.

The state appellate court rejected Petitioner's claims.  First, it recognized that, under California law, every plea must be personally entered or withdrawn by the defendant in open court.  Resp. Ex. 11 at 28.  Here, the record demonstrated that Petitioner personally entered an NGI plea in October 2004.  However, there was no indication that Petitioner ever personally withdrew that plea.  The state appellate court concluded that the 2007 amended information and re-arraignment did not cure the error because Petitioner did not personally enter any plea at that time.  Id. at 29-30.  Nonetheless, the state appellate court concluded that even though the failure to hold a sanity trial or acquire Petitioner's plea resulted in an error, the error was

1   purely a statutory error – not constitutional, and Petitioner was not prejudiced by the

2   error. Id. at 30-32.  To that end, the state appellate court reasoned that, because

3   Petitioner did not establish that he would have continued to pursue an NGI defense

4   over the advice of counsel, his federal constitutional claim necessarily failed as well.

5   Id. at 32, n.26.

6          The Sixth Amendment right to a jury trial applies to state criminal trials

7   through the Due Process Clause of the Fourteenth Amendment.  See Duncan v.

8   Louisiana, 391 U.S. 145, 149 (1968).  This right only attaches to criminal trials.  See

9   Chatman v. Marquez, 754 F.2d 1531, 1534 (9th Cir. 1985).  As an initial matter, the

10  United States Supreme Court has not addressed whether a trial court deprives a

11  criminal defendant of his right to a jury trial if he does not receive a sanity trial after

12  pleading NGI.  Because there is no United States Supreme Court case addressing

13  this issue, the state court's decision on Petitioner's claims does not violate AEDPA

14  and may not be set aside.  "If Supreme Court cases 'give no clear answer to the

15  question presented,' the state court's decision cannot be an unreasonable application

16  of clearly established federal law."  Ponce v. Felker, 606 F.3d 596, 604 (9th Cir.

17  2010) (quoting Wright v. Van Patten, 552 U.S. 120, 126 (2008)); Stevenson v.

18  Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004) ("If there is no Supreme Court

19  precedent that controls a legal issue raised by a petitioner in state court, the state

20  court's decision cannot be contrary to, or an unreasonable application of, clearly-

21  established federal law.").  Thus, Petitioner is not entitled to relief on this claim.

22         Moreover, "federal law does not mandate jury consideration of insanity every

23  time an NGI plea is entered."  Pennywell v. Rushen, 705 F.3d 355, 357 n.1 (9th Cir.

24  1983).  Rather, a criminal defendant has the "right to have a jury determine, beyond

25  a reasonable doubt, his guilt of every element of the crime with which he is

26  charged."  United States v. Gaudin, 515 U.S. 506, 522-23 (1995).  In California, a

27  finding of insanity "is dispositive only on the question of whether the accused is to

28

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

United States District Court

For the Northern District of California

1    be held criminally responsible for committing the charged offense[,] it is not

2    determinative of whether the elements of the offense, and thus the criminal conduct

3    itself, have been established." People v. Hernandez, 22 Cal. 4th 512, 531 (2000)

4    (Brown, J. concur).  Because a finding of insanity is not an element of the crime

5    charged, the state court's conclusion that Petitioner's right to a jury trial was not

6    violated, was not contrary to, or an unreasonable application of, clearly established

7    Supreme Court law.  Cf. Leach v. Kolb, 911 F.3d 1249, 1255-58 (7th Cir. 1990)

8    (finding that there was no federal constitutional violation when the trial court

9    directed a verdict on an insanity plea because the defendant failed to present

10   sufficient evidence to create a viable jury question on the issue).

11           4.      Motion to Dismiss / Ineffective Assistance of Counsel

12           Plaintiff claims that the trial court erred in denying his motion to dismiss

13   based on ineffective assistance of counsel on the ground that counsel unnecessarily

14   turned over a 12-page copy of a report written by a private investigative firm, hired

15   by counsel, to the prosecutor. Pet. at 17-21.  The report contained interviews with

16   Anderson, Turner, and Roberson, and accordingly to Petitioner, lightened the

17   prosecution's burden of proof.

18           The state appellate court summarized the events as follows:

19               In February 2006, [counsel] received a report from a
         defense investigator.  The report contained summaries of
20       interviews with Anderson, Turner and Roberson.  [FN18]  In April
         2007, she faxed a copy of this report to the prosecutor.  The report
21       was part of the case file when the prosecutor who ultimately tried
         the case was assigned to Hayes's case in May 2008.
22
               FN18. Key aspects of these interview summaries are set out
23       in part IV.B.3., post.

24               In July 2008, before trial began, Hayes's public defender
         moved to dismiss the entire action, based on a claim that [counsel]
25       had provided ineffective assistance of counsel.  He asserted that
         her investigator interviewed two key prosecution witnesses –
26       Turner and Anderson – after talking extensively with Hayes.  The
         public defender argued that the report contained work product and
27       statements from prosecution witnesses that should not have been
         disclosed to the prosecution.  He reasoned that [counsel] provided
28

United States District Court

For the Northern District of California

the entire report to prosecutors, who read it and used it to prepare those prosecution witnesses for trial.

In the motion, the public defender argued that [counsel's] error could assist the prosecution in convicting Hayes.  He argued that the discovery violation constituted a violation of his constitutional rights to a fair trial, to cross-examine and confront witnesses, to due process, to his present evidence in his own defense, and to the effective assistance of counsel.  As a remedy, the public defender sought dismissal of the charges against Hayes.

The trial court reviewed the report and ultimately denied the motion to dismiss.  It found that none of the information in the report fell within the attorney-client privilege; that there was no evidence that any specific information pursued by the investigator came from Hayes himself; that the public defender could only speculate that anything revealed in the report would not have been otherwise discovered by the prosecution; that Hayes was not prejudiced by any disclosure of information that would be inadmissible at trial; and that his rights were not violated by the disclosure of the investigator's report.  It found no basis for dismissal of the action.

Both Anderson and Turner testified in December 2000 at Hayes's preliminary hearing conducted 18 months after Zepeda's death.  At the time of the July 2008 hearing on the motion to dismiss, the prosecution intended to call both as prosecution witnesses.  During the subsequent trial, both testified for the prosecution.

Resp. Ex. 11 at 22-23.

The state appellate court rejected this claim.

2. Context of Disclosure

We begin by placing the disclosure in context.  The motion to dismiss is premised on the assumption that the prosecution had no other means to acquire the information disclosed in the report.  This assumption does not hold up to close examination.  [FN20] For example, the public defender compared what Anderson told police in 1999 with what the investigator's report revealed from her in 2006, reasoning that the report gave the prosecution information that it would not otherwise have had.  However, by the time the investigator's report reached the prosecution in April 2007, Anderson had testified at the preliminary hearing in December 2000.  At the time of her February 2006 interview summarized in the defense investigator's report, she had already talked with the prosecutor and detectives about the case.

FN20. At the hearing, the trial prosecutor told the court that he had not spoken with the investigator or anyone associated with his firm about the report.  We recognize that this does not preclude the possibility that the

United States District Court

For the Northern District of California

prosecution questioned Anderson, Turner or Roberson about the report's contents.

Within hours of Zepeda's death, the police understood that Hayes had spent the night at Anderson's home on the night of the Zepeda attack. They knew that a vehicle matching the description of the one seen at the scene of the Zepeda attack was found near Anderson's home. Clearly, she was a person that police and the prosecution would have questioned repeatedly about the events of that night – most likely, long before the defense investigator's report reached them in April 2007. [FN21] Thus, any claim that the prosecution obtained evidence from the report that it would not have found as a result of its normal investigation is speculative.

> FN21. This conclusion is bolstered by the record on appeal. For example, shortly before the motion was argued, the prosecution offered Anderson's testimony that she terminated her relationship with Hayes after he struck her as evidence tending to negate mistake or lack of intent. (Evid.Code, § 1101.) The trial court ruled that the evidence would not be admitted.

The motion to dismiss was also premised on the assumption that specific evidence came from Hayes himself. At the hearing on the motion, his public defender argued as much again and again. However, a review of the report itself does not support this assumption. The February 2006 investigative report noted that the investigator spoke twice with Hayes and once with his parents, gleaning unspecified information and leads to be explored. As the trial court noted correctly, there was no specific source for any substantive lead noted in the report, which satisfied the trial court – and satisfies our court – that the report did not reveal the substance of any confidential communications.

3. Lack of Error and Prejudice

Much of the February 2006 investigative report repeated evidence that had come out at the preliminary hearing, but the report did contain four pieces of information that Hayes contends were improperly disclosed to the prosecution. As we shall explain, each of these disclosures was either required or nonprejudicial.

First, Anderson told the investigator that she saw blood on Hayes's white socks when he came to her home on the night of July 25, 1999. The trial court ruled that it was too speculative to conclude the prosecution would not have discovered this evidence other than by means of the report. We agree with this conclusion. (See pt. IV.B.2., ante.)

We also conclude that Hayes suffered no prejudice from this disclosure. At trial, Anderson testified for the prosecution, stating that Hayes wore white socks that night. The evidence that

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

United States District Court

For the Northern District of California

Anderson and her daughter saw blood on Hayes's white socks that night was not offered by the prosecution, but by Hayes during Anderson's cross-examination. The prosecution offered evidence that Hayes's slacks, jacket and shoes that he wore when Anderson saw him had Zepeda's blood on them, but did not offer any evidence that his socks were even collected by police. In a case with so much physical evidence linking Hayes's seized clothing with the attack on Zepeda, this passing reference to blood on his socks – blood that could have come from Hayes's injured hand as easily as from some other source – was of minimal probative value. Thus, we are satisfied that the disclosure of that aspect of the report did not prejudice Hayes.

Second, the investigator questioned Anderson about a report from an unspecified source that Hayes and Zepeda had been driving on July 25, 1999, that they had seen Anderson and a Black man on the street, and that Hayes had given Anderson and her companion a ride. In two separate interviews, she told the investigator that this report was untrue. As Anderson did not confirm this report, the trial court found that the fact of this meeting between Hayes, Zepeda and Anderson was not established. When the public defender argued that Hayes could be impeached with Anderson's denial if he chose to testify, the trial court ruled that the prosecutor would not be permitted to impeach him based on evidence gleaned from this report. As the evidence could not be used against Hayes at the subsequent trial, he suffered no prejudice from its disclosure.

Third, Anderson reported that Hayes suffered from a mental condition; that he is easily set off; that he had been ordered to attend anger management classes; that a woman particularly had to be careful of not to raise a voice at him; that he was normally cool, but had a "really bad temper." Again, the trial court ruled that this constituted inadmissible character evidence that would not be admitted at trial. Based on that proper evidentiary ruling, Hayes was not prejudiced by this disclosure.

Lastly, Anderson recalled that when she and Hayes were walking on the night of July 25, 1999, they met Charles Roberson, who was driving by. He agreed to give them a ride. The investigator questioned Roberson about this report. At first, Roberson denied that he had given Hayes and Anderson a ride around the time of the assault on Zepeda. Later, he recanted, saying that he did. Roberson testified for the defense, telling the jury that he was with Hayes and Anderson in Oakland sometime between 8:30 and 9:30 p.m. on the night when Zepeda was attacked in San Leandro. As the public defender conceded at the hearing on the motion to dismiss, the defense was required to disclose the investigator's report of his statement. (Former § 1054.3, subd. (a) [added by initiative measure (Prop.115), eff. June 6, 1990]; see Roland v. Superior Court (2004) 124 Cal.App.4th 154, 169.) Thus, disclosure of this aspect of the investigator's report was not improper.

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

25

1

2          As disclosure of the cited aspects of the investigator's
   report was either proper or did not result in any prejudice to
3          Hayes, he has not established ineffective assistance of counsel by
   a preponderance of evidence.  (See, e.g., People v. Ledesma,
4          supra, 43 Cal.3d at p. 218.)  His ineffective assistance of counsel
   claim is meritless.

Resp. Ex. 11 at 24-27.

        A claim of ineffective assistance of counsel is cognizable as a claim of denial

of the Sixth Amendment right to counsel, which guarantees not only assistance, but

effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

petitioner must establish two things.  First, he must establish that counsel's

performance was deficient, i.e., that it fell below an "objective standard of

reasonableness" under prevailing professional norms.  Id. at 687-88.  Second, he

must establish that he was prejudiced by counsel's deficient performance, i.e., that

"there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."  Id. at 694.  A reasonable

probability is a probability sufficient to undermine confidence in the outcome.  Id.

A court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the defendant as the result of the alleged

deficiencies.  See id. at 697.  Where the defendant is challenging his conviction, the

appropriate question is "'whether there is a reasonable probability that, absent the

errors, the factfinder would have had a reasonable doubt respecting guilt.'"  Luna v.

Cambra, 306 F.3d 954, 961 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 695).

        Each of the four pieces of information Petitioner complained was improperly

disclosed to the prosecution were either required or non-prejudicial.  Specifically,

with regard to Anderson's statement to the investigator she saw blood on

Petitioner's socks, Petitioner cannot show that he was prejudiced by this disclosure.

First of all, as the state appellate court observed, counsel for Petitioner introduced

this statement into evidence during his cross-examination of Anderson during trial.

1    Further, in light of the other physical evidence that was introduced into trial

2    identifying Zepeda's blood on Petitioner's slacks, jacket and shoes, even if

3    Anderson's statement that she noticed spots of blood on Petitioner's socks was not

4    admitted into evidence, it was not reasonably probable that the jury would have had

5    a reasonable doubt respecting guilt.  See Luna, 306 F.3d at 961.

6         With regard to unsourced statements that Petitioner and Zepeda were driving

7    together on the night she was killed, and picked up Anderson and an unidentified

8    male, Anderson denied that this happened at two different interviews.  Further,

9    because the trial court ruled that this unsourced statement would not be admissible

10   against Petitioner at trial, it was not admitted.  Thus, there was no prejudice.

11        With regard to Anderson's statements that, inter alia, Petitioner had been

12   ordered to attend management classes and had a "really bad temper," again, because

13   the trial court ruled that this character evidence would not be admitted at trial, it was

14   not admitted.  Thus, there was no prejudice.

15        Finally, with regard to Roberson's initial denial and later recantation that he

16   gave Petitioner and Anderson a ride the night of Zepeda's murder, Petitioner

17   conceded that this statement was a required disclosure under California law.  Thus,

18   counsel was not deficient.

19        After reviewing the trial court record, including the investigative report (CT

20   351-362) and the hearing on the motion (1 RT 43-67), this Court concludes that the

21   state appellate court's conclusion that there was no prejudice as a result of counsel's

22   disclosure of the investigative report was a reasonable application of Strickland.

**CONCLUSION**

24        After a careful review of the record and pertinent law, the Court concludes

25   that the Petition for a Writ of Habeas Corpus must be **DENIED**.

26        Further, a Certificate of Appealability is **DENIED**.  See Rule 11(a) of the

27   Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.11\00161Hayes_deny petition-coa.wpd

27

United States District Court
For the Northern District of California

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Nor has

Petitioner demonstrated that "reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel,

529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of

Appealability in this Court but may seek a certificate from the Court of Appeals

under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the

Rules Governing Section 2254 Cases.

The clerk shall terminate any pending motions, enter judgment in favor of

Respondent, and close the file.

SO ORDERED.

DATED: _____11/1/2012_____        _____
                                        EDWARD J. DAVILA
                                        United States District Judge

1

2

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

3

4

MILTON N. HAYES,

Case Number: CV11-00161 EJD

Petitioner,

5

**CERTIFICATE OF SERVICE**

6

v.

7

ANTHONY HEDGPETH,

8

Respondent. _____/

9

10

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

11

12

13

That on _____11/2/2012_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

14

15

Milton N. Hayes G37757
Folsom State Prison
P.O. Box 290066
Represa, CA  95671

16

17

Dated:  _____11/2/2012_____

18

Richard W. Wieking, Clerk
/s/ By: Elizabeth Garcia, Deputy Clerk

19

20

21

22

23

24

25

26

27

28

Milton N. Hayes G37757
Folsom State Prison
P.O. Box 290066
Represa, CA  95671

CV11-00161 EJD